[Cite as *State v. Fannon*, 2018-Ohio-5242.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 17CA24 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| KAYLA ANN FANNON, | : | |
| Defendant-Appellant. | : | |
| | : | |
| STATE OF OHIO, | : | Case No. 17CA26 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| SAMUEL A. THOMPSON | : | |
| Defendant-Appellant. | : | **RELEASED: 12/10/2018** |

APPEARANCES:

Krista Gieske, Gieske Law Office, LLC, Cincinnati, Ohio, for appellant Samuel A. Thompson.

Patrick T. Clark, Assistant State Public Defender, Office of the Ohio Public Defender, Columbus, Ohio for appellant Kayla Ann Fannon.

Keller J. Blackburn, Athens County Prosecuting Attorney, Merry M. Saunders and Elizabeth Pepper, Athens County Assistant Prosecuting Attorneys, Athens, Ohio, for appellee.

Harsha, J.

{¶1} A jury found Kayla Ann Fannon and Samuel A. Thompson guilty of two counts of endangering children and one count of permitting child abuse of their three-month old infant A.T.. The trial court sentenced them each to prison.

{¶2} In this consolidated appeal Fannon and Thompson raise a combined total of eight errors. We reject all of them.

## I. FACTS & PROCEDURAL HISTORY

{¶3} An Athens County Grand Jury initially indicted Fannon and Thompson on one count of Permitting Child Abuse in violation of R.C. 2903.15(A) and one count of Child Endangering in violation of R.C. 2919.22(A), both third-degree felonies. A superseding indictment added a second count of Child Endangering in violation of R.C. 2919.22(B)(1), a second-degree felony.

{¶4} The state moved for a joinder of the cases, which Fannon opposed. The trial court granted the state's motion and the case proceeded to a jury trial on Monday, May 8, 2017. On Friday, the fifth day of trial, Fannon and Thompson failed to appear. Trial counsel was unable to locate them or secure their appearance.  The trial court recessed trial until Tuesday and issued warrants. At a status conference Monday, May 15, 2017 counsel for Thompson and Fannon advised they had no contact with their clients over the weekend and had no information about their whereabouts. The trial court granted the state's request to proceed without Thompson and Fannon.

{¶5} The jury returned verdicts finding Thompson and Fannon guilty on all counts. Five days after the jury verdict, authorities located Thompson and Fannon several counties away in a motel in Lockbourne, Ohio and took them into custody. Both Thompson and Fannon pleaded guilty to charges of failure to appear. The trial court refused to merge any of the counts and sentenced Thompson to an aggregate prison term of 15 and one-half years and Fannon to an aggregate prison term of 11 and one-

half years, each defendant's sentence included an 18-month sentence for failure to appear.

{¶6} The trial testimony and exhibits established that A.T. was born healthy on November 12, 2013 to Fannon and Thompson. Her health was typical and normal during her first few weeks of life. At A.T.'s two-month appointment, her pediatrician Dr. Zidron identified a small healing bruise on A.T.'s jaw line that is unusual for nonmobile infants. She also diagnosed A.T. with an upper respiratory infection and a failure to thrive. Dr. Zidron scheduled a two-week follow-up appointment to monitor A.T.'s condition but Fannon and Thompson failed to bring A.T. to that appointment. Dr. Zidron did not see A.T. again.

{¶7} On Friday evening, February 28, 2014 at about 9:20 p.m., Fannon took A.T. to the emergency room at O'Blenness Memorial Hospital. Fannon told the emergency room physician, Dr. Nathan Lowien, that a two-year-old cousin had fallen on A.T. on Wednesday, February 26 and caused a bruise on her forehead and swelling of her right foot. Dr. Lowien noted that A.T. appeared more fatigued than normal. Dr. Lowien was concerned that A.T. was abnormal for her age and that her injuries did not add up with the reported event of a two-year-old child falling on her. Fannon did not give any other cause for A.T.'s injuries. Dr. Lowien notified Children's Protective Services because he was concerned that A.T. had suffered abusive injuries. Dr. Lowien testified that A.T.'s condition was serious, so he transferred her to Nationwide Children's Hospital by ambulance for further testing and evaluation. Fannon did not accompany A.T. in the ambulance.

{¶8} During the trip to Nationwide Children's Hospital, the emergency medical technician became concerned because A.T. would not wake up. The technician had to resort to flicking A.T.'s foot firmly to get her to wake up. When A.T. did finally wake up, the technician testified that A.T.'s left eye started moving to the left, which could be indicative of a brain injury. A.T. arrived at Nationwide Children's Hospital at approximately 1:45 am Saturday, March 1, 2014.

{¶9} A number of physicians treated A.T. during her hospitalization, including Dr. Brent Adler, a pediatric radiologist, and Dr. Megan Letson, a child abuse pediatrician. According to these physicians A.T. suffered a complex skull fracture, going in multi-directions, multiple healing rib fractures on both the front and back portions of the ribs, a healing fracture on the right femur, three broken fingers on her right hand, healing fractures of the pubic bone, a fracture of the left toe, fractured acromions (shoulder blade), a healing fracture on the left tibia, a frenulum tear (the tissue that connects the lip to the gum), and a significant, life-threatening brain injury with swelling and blood on the brain. A.T. suffered "metaphyseal fractures" resulting from a shaking or other non-accidental trauma and her brain injury resulted in global developmental delay, which includes delayed speech, gross motor, and fine motor skills.

{¶10} Dr. Adler was confident the brain injury was more than twelve hours old and probably twenty-four hours given the degree of definition in the scan and placed A.T. at risk of becoming brain dead. Other fractures were determined to be one week old to four weeks old, depending upon the specific bone fractured. Both doctors testified that the injuries were inconsistent with accidental trauma, extremely unusual in nonmobile infants, could not be explained by the incident involving the young toddler

jumping or falling on A.T., and were the result of at least two separate traumatic incidents. Moreover, Dr. Adler determined that A.T. had no features that would indicate she had Osteogenesis Imperfecta (brittle bone disease).

{¶11} Dr. Letson testified that frenulum tears in a nonmobile infant are caused by a blunt object to the mouth, such as forced bottle or spoon feeding or a punch to the mouth that is accompanied with sudden profuse bleeding. However, Fannon and Thompson told Dr. Letson that A.T. had no history of bleeding of the mouth. Dr. Letson considered A.T.'s injuries to be inflicted, rather than accidental, and her final diagnosis was "physical abuse which included abuse of [sic][1] head trauma."

{¶12} A.T.'s adoptive mother, Melissa Trombley, testified that she was A.T.'s foster mother before adopting her. Trombley testified that A.T. continues to receive medical care after her release from Nationwide Children's, including orthopedic surgeons, a neurologist, a neurosurgeon, and several doctors at a traumatic brain injury clinic.  A.T. suffers developmental delays in mobility and speech and was unable to crawl because she lacks the use of her right arm; she sees an occupational therapist to help her develop motor skills. Trombley testified that A.T. is legally blind, has no depth perception and has no peripheral vision. Trombley testified that A.T walks with her left foot down but on her right toes to the side and that she walks sideways because of her vision problems. Trombley testified that A.T. continues to receive therapy at a special preschool for children with disabilities. Trombley testified that since A.T. has been in Trombley's care A.T. has not broken any bones or suffered any injuries that would require hospitalization.

---

[1] The transcript may contain a typographical error such that "abuse of" should be "abusive."

{¶13}  Because of the abusive nature of A.T.'s injuries, Detective Brice Fick and Detective John Deak of the Athens County Sheriff's Office became involved. Detective Deak interviewed Fannon and Thompson on March 1, 2014; both detectives interviewed Fannon and Thompson again on March 7, 2014. Deak testified that from his interviews of Fannon and Thompson he learned that Thompson was unemployed. Fannon was employed at a Hocking Hills inn/restaurant but it was a slow period and she worked only 15 hours a week. Fannon and Thompson told both detectives that they were A.T.'s primary caregivers and that A.T. was in their care 98% of the time, though there was an occasional hour or two a week when Thompson would have his mother watch her.

{¶14}  Thompson told Detective Deak that on Thursday, February 27, 2014, he had noticed A.T.'s eyes start to cross and slant downward. Thompson explained to Deak that he had learned that A.T.'s injuries were caused the previous day, Wednesday February 26, when an eighteen-month-old cousin had accidentally jumped on A.T. while Thompson's mother was watching her. Thompson told Deak that A.T. was in his mother's care from 11:00 am until 8:30 pm, while he and Fannon helped Thompson's brother move. Thompson told Deak that A.T. appeared normal on Wednesday evening when he picked her up from his mother. Fannon had gone to work at approximately 5 pm Wednesday and returned home at approximately 10:30 pm. Fannon told Deak that when she returned home from work that evening A.T. seemed fine and was sleeping.

{¶15}  Thompson's mother, Teresa Tolliver, testified that A.T.'s injuries occurred when a seventeen-month-old cousin[2] jumped on her. Tolliver described how the cousin

_____

[2] The record contains conflicting ages for the cousin. Dr. Lowien testified Fannon told him the cousin was two years old, Detective Deak testified Thompson told him the cousin was eighteen months old, and Tolliver testified the cousin was seventeen months old.

jumped from the coffee table to the couch, a distance of about one foot, and landed on

A.T.'s lower body. Tolliver testified that she picked A.T. up and looked at her and did not

believe A.T. had been hurt. Tolliver stated that A.T. was always under her supervision

that day and neither Tolliver nor anyone else in the home caused any other injuries to

A.T. The jumping incident was insignificant enough to Tolliver that she did not report it

to Thompson when he came to pick up A.T. that evening.

{¶16} Both Fannon and Thompson denied causing A.T.'s injuries and, other than

the jumping incident involving the young cousin, had no other explanation for her

injuries. Other relatives testified that they did not cause the injuries to A.T. nor did they

witness anyone else injure A.T.

## II. ASSIGNMENTS OF ERROR

{¶17} Fannon asserts five assignments of error for our review:

I.    THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT
      FAILED TO SEVER KAYLA AND SAM'S TRIALS, DENYING
      KAYLA BOTH DUE PROCESS AND THE RIGHT TO CONFRONT
      A WITNESS AGAINST HER. CRIM.R. 8; CRIM.R. 14; FIFTH,
      SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED
      STATES CONSTITUTION; *STATE V. LOTT*, 51 OHIO ST.3D 160,
      55 N.E.2D 293 (1990); *BRUTON V. UNITED STATES*, 391 U.S.
      123, 88 S.CT. 1620, 20 L.ED.2D 476 (1968).

II.   PROSECUTORIAL MISCONDUCT DENIED KAYLA A FAIR
      TRIAL AND DUE PROCESS OF LAW, IN VIOLATION OF HER
      FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS
      UNDER THE UNITED STATES CONSTITUTION, ARTICLE I,
      SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION, AND
      R.C. 2901.05.

III.  THE TRIAL COURT ERRED WHEN IT ADMITTED IRRELEVANT
      AND PREJUDICIAL EVIDENCE DENYING KAYLA HER RIGHTS
      TO DUE PROCESS AND A FAIR TRIAL. EVID. R. 401, 403(A),
      404(B); R.C. 2945.59; FIFTH AND FOURTEENTH
      AMENDMENTS TO THE UNITED STATES CONSTITUTION AND
      ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

IV.     THE TRIAL COURT VIOLATED KAYLA'S RIGHT TO DUE
        PROCESS AND A FAIR TRIAL WHEN, IN THE ABSENCE OF
        SUFFICIENT EVIDENCE, IT FOUND KAYLA GUILTY OF
        ENDANGERING CHILDREN AND PERMITTING CHILD ABUSE.
        FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED
        STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE
        OHIO CONSTITUTION. *IN RE WINSHIP*, 397 U.S. 358, 90
        S.CT.1068, 25 L.E.D. [sic] 368 (1970); *JACKSON V. VIRGINIA*,
        443 U.S. 307, 99 S.CT. 2781, 61 L.ED.2D 560 (1979).

V.      KAYLA WAS DENIED THE EFFECTIVE ASSISTANCE OF
        COUNSEL WHEN TRIAL COUNSEL FAILED TO MOVE TO
        SEVER HER TRIAL FROM SAM'S, OBJECT TO REPEATED
        PROSECUTORIAL MISCONDUCT, OBJECT TO THE
        ADMISSION OF PREJUDICIAL EVIDENCE, DIRECT THE
        JURY'S ATTENTION TO STATE'S EVIDENCE THAT
        CORROBORATED KAYLA'S DEFENSE, AND MAKE A ROBUST
        CRIM.R. 29 MOTION. *STRICKLAND V. WASHINGTON,* 466 U.S.
        668, 104 S.CT. 2052, 80 L.ED.2D 674 (1984); *STATE V.
        BRADLEY*, 42 OHIO ST.3D 136, 538 N.E.2D 373 (1989).

**{¶18}** Thompson asserts three assignments of error for our review:

I.      THOMPSON'S CONVICTIONS MUST BE REVERSED WHERE
        THE CUMULATIVE EFFECT OF ERRORS PERPETRATED IN
        THE LOWER COURT THROUGHOUT PROCEEDINGS
        DEPRIVED HIM OF HIS CONSTITUTIONAL RIGHTS TO DUE
        PROCSS [SIC] AND A FAIR TRIAL.

II.     THE SENTENCING COURT ERRED IN FAILING TO MERGE
        THOMPSON'S CONVICTIONS FOR THE PURPOSES OF
        SENTENCING BECAUSE THEY WERE ALLIED OFFENSES OF
        SIMILAR IMPORT.

III.    THE SENTENCING COURT ERRED IN FAILING TO WAIVE
        COSTS OF EXTRADITION.


### III. LAW AND ANALYSIS

**{¶19}** For ease of discussion we address some of appellants' assignments of

error out of order and some of them jointly.

### A.  Joinder

**{¶20}** Fannon contends that the trial court erred when it failed to sever her case from Thompson's. However, she concedes that she did not filed a motion for severance under Crim.R. 14 and has forfeited all but plain error. *See State v. Miller,* 105 Ohio App.3d 679, 664 N.E.2d 1309 (4th Dist.).

**{¶21}** To prevail under this standard the defendant must establish that an error occurred, it was obvious, and it affected his or her substantial rights. See Crim.R. 52(B); *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) (an error affects substantial rights only if it "affected the outcome of the trial"). We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 63-64 (2016) citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

1. Stipulation to "Serious Physical Harm"

**{¶22}** Fannon contends that the trial court erred in failing to sever her case from Thompson's because she was prevented from stipulating that A.T.'s injuries satisfied the definition of "serious physical harm," an element of permitting child abuse under R.C. 2903.15(A). Fannon argues that she was willing to stipulate to this element, but Thompson was not. Thus, she argues that she was prejudiced because evidence of "heart-breaking details" of A.T.'s physical impairments, including A.T.'s blindness, academic delays and physical limitations created a strong risk that jury sympathy for A.T. would prejudice Fannon.

**{¶23}** However the state refused to stipulate to the "serious physical harm" element of its case. *See Graves Lumber Co. v. Croft*, 9th Dist. Summit No. 26624,

2014-Ohio-4324, 20 N.E.3d 412, ¶ 23 (A stipulation is "[a] voluntary agreement between opposing parties concerning some relevant point; esp[ecially], an agreement relating to a proceeding, made by attorneys representing adverse parties to the proceeding. Black's Law Dictionary 1455 (8th Ed. 2004)"). "As a general proposition, no party is required to stipulate with an adversary and may insist upon proving the facts of its case." *State v. Sampsill,* 4th Dist. Pickaway No. 97CA17, 1998 WL 346680, *8 (June 29, 1998). There is no evidene in the record that the state would have accepted either defendant's offer to stipulate that A.T. suffered "serious physical harm." Thus Fannon can show no error, plain or otherwise, in the court's decision not to sever her case from Thompson's.

2. The *Bruton* Rule and the Confrontation Clause

**{¶24}** Fannon also contends that admission of two of Thompson's statements in the joint trial violated her Sixth Amendment right to cross-examine Thompson under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). She argues that Thompson's statement that A.T. was in their care 98% of the time "was so high as to be a functional confession – if Sam was with A.T. 98% of the time, then it was likely he was responsible for hurting A.T." Fannon also argues that Thompson admitted to hurting A.T. in an "apology letter" and she was prejudiced by her inability to confront Thompson about the letter.

**{¶25}** The state contends that Fannon's argument is entirely speculative because Fannon and Thompson fled the jurisdiction on the fifth day of trial. The state also contends that Fannon gave the same percentages of time to the investigators, and

that the apology letter does not provide an admission that Thompson or Fannon caused

injury to A.T.

**{¶26}** In summary *Bruton, supra,* holds:

" * * * in a joint trial of two defendants, a confession of one co-defendant who did not testify could not be admitted into evidence even with a limiting instruction that the confession could only be used against the confessing defendant. The rationale of Bruton was that the introduction of a potentially unreliable confession of one defendant which implicates another defendant without being subject to cross-examination deprives the latter defendant of his right to confrontation guaranteed by the Sixth Amendment."

*State v. Moritz*, 63 Ohio St.2d 150, 153, 407 N.E.2d 1268 (1980) quoting *United States*

*v. Fleming*, 594 F.2d 598, 602 (7th Cir.1979).

**{¶27}** The Supreme Court of Ohio applies *Bruton* even when the statement does

not explicitly implicate the co-defendant:

(T)he Bruton rule applies with equal force to all statements that tend significantly to incriminate a co-defendant, whether or not he is actually named in the statement. The fact that the incrimination amounts to a link in a chain of circumstances rather than a direct accusation cannot dispose of the applicability of the Bruton rule. Just as one can be convicted on circumstantial evidence, one can be circumstantially accused. *Fox v. State* (Ind.App.1979) [179 Ind.App. 267], 384 N.E.2d 1159, 1170.

*Moritz*, 63 Ohio St.2d at 155.

**{¶28}** Nonetheless, the *Bruton* rule and the Confrontation Clause involve only

"testimonial" statements, *see State v. Luckie*, 2018-Ohio-594, 106 N.E.3d. 289, ¶ 44 (5th

Dist.) quoting *State v. Carter*, 2017-Ohio-7501, 96 N.E.3d 1046, ¶¶ 38–39 (7th Dist.).

**{¶29}** A "testimonial" statement is "one made 'under circumstances which would

lead an objective witness reasonably to believe that the statement would be available for

use at a later trial.' " *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834,

¶ 36 quoting *Crawford v. Washington*, 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177

(2004); *Luckie* at ¶ 45.

In determining whether a statement is testimonial for Confrontation Clause purposes, courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations. This test conforms to *Crawford* and is supported by both state and federal authority. This definition also prevents trampling on other portions of hearsay law that *Crawford* expressly states do not implicate the right to confront witnesses.

*Stahl* at ¶36.

**{¶30}** We question whether the *Bruton* rule is applicable. Both co-defendants fled the jurisdiction together in the middle of the trial and Thompson was not present to assert either his right to testify, or his right not to. After the state put on its case Fannon was to present her defense, then Thompson his. According to the record the trial commenced on a Monday, Fannon presented her defense on Thursday and testified in her defense. Based on statements from Thompson's attorney, the trial court decided to stop for the day on Thursday afternoon. Thursday evening Fannon and Thompson fled the jurisdiction. After neither was located over the weekend, the court issued arrest warrants and proceeded without them the following Tuesday. Fannon's trial attorney formally rested Fannon's case, and although Thompson's attorney had previously stated he had witness testimony to present, after Thompson disappeared his attorney rested his case without calling a witness. Thus Fannon was not prevented from cross-examining Thompson because he had asserted his right not to testify. Rather she and Thompson fled the jurisdiction and were absent for the remainder of the trial. Her argument that her right to confrontation was violated is entirely speculative.

**{¶31}** The parties have cited no case law, nor have we found any, that has analyzed the *Bruton* rule in this unique situation. Assuming arguendo that the *Bruton* rule applies here, we find no error, plain or otherwise, in the court's decision not to sever

her case. *Bruton* applies only to "testimonial" statements that are "incriminating" or that "tend significantly to incriminate" a co-defendant. Thompson's statement to Detective Deak that A.T. was in his and Fannon's care 98% of the time, even though testimonial, was not incriminating in any way. "Incriminating" means "demonstrating or indicating involvement in criminal activity." Black's Law Dictionary (8th Ed.2004). A.T. was a newborn infant and was three months old at the time of the investigation. There is nothing incriminating about a statement that a three-month-old infant spends 98% of the time in the care and custody of its parents, particularly here where one parent is unemployed. Fannon's own testimony was that she was employed, but it was "a slow time" and A.T. was in her care about 85% of the time. *See State v. Hopkins*, 2nd Dist. Montgomery No. 24940, 2012-Ohio-5536, ¶ 44 ("A *Bruton* problem arises in a joint trial of two or more defendants when evidence of a confession or statement by a non-testifying defendant is admitted that implicates the other defendant(s) in criminal activity" and where the "statement did not implicate the [appellant] in any criminal activity * * * we see no *Bruton* problem.").

**{¶32}** Even if we assume Thompson's statement was incriminating, the investigators testified that both Fannon and Thompson agreed to the 98% percentage figure. Thus, according to the investigators, it was a statement Fannon had also made, though she contested this in her trial testimony. And, it did not prejudice Fannon's defense, which was that the toddler's jumping/falling caused A.T.'s injuries.

**{¶33}** Thompson's handwritten "apology letter" to Fannon was not testimonial and does not implicate Fannon in criminal activity. The state found the apology letter during a search of Thompson and Fannon's residence and used it as evidence they had

"relationship issues." In it Thompson apologizes for his "mouth" and assures Fannon he would never physically hurt her or A.T.:

> I've been a real asshole and have said a lot of fucked up shit! * * * I've failed as a man – my job is to keep you and [A.T.] safe and protected but all I've done is hurt you guys by belittling you! * * * Hell I get mad and yell at her and you, more than I say I love you! * * * I need you to help me lose my anger. My mouth was the reason I got hit by a car and now its [sic] affecting my family. When I'm mad I'm sure I don't do things the easiest or safest way either. I just don't want to lose your faith or belief in me. I heard the doubt in your voice today on the phone, I do not hurt [A.T.] intentionally. God strike me dead before I put my hands on my family! I hope you do believe that bc [sic] I'd do anything for you guys. My anger is gone! I need you to help me Kayla. I want to be happy again! Another thing: You are the most amazing mother, wife and woman I know. You are very special to me and I need to tell you this more! I love you baby girl! * * * .

**{¶34}** In determining whether the apology letter is testimonial, we focus on the expectations of the declarant at the time the statement was made. There is nothing in the record to suggest that Thompson wrote this personal apology letter with any expectation that it would be read by anyone other than Fannon. Although the letter is not dated, it was written prior to the investigation and the March 1, 2014 search of the residence. There is no evidence in the record that it was written under circumstances that would cause an objective witness to reasonably believe it would be available for use at a later trial. Therefore, it is not testimonial and does not violate the *Bruton* rule. *See State v. Luckie,* 2018-Ohio-594 at ¶ 46; *State v. Carter*, 2017-Ohio-7501 at ¶ 39.

**{¶35}** Because Thompson's statement that three-month-old A.T. was in the care of her parents 98% of the time is not incriminating and the apology letter is not testimonial, neither statement violates the *Brunton* rule. The trial court had no basis under *Bruton* to sever Fannon's case from Thompson and try them separately. The trial

court did not commit any error, plain or otherwise, when it did not sever the two cases on *Bruton* grounds.

B. Prosecutorial Misconduct

**{¶36}** Fannon contends that prosecutorial misconduct deprived her of a fair trial. She argues that the prosecutor used a slide with "guilty" written on it during opening statement, denigrated defense counsel during voir dire, inflamed the passions of the jury during opening statement by showing a picture of A.T., and put Fannon on trial for "enjoying work." Fannon concedes that trial counsel only objected to the "guilty" slide and the plain-error analysis applies to the other instances of alleged prosecutorial misconduct. Thompson also contends that the prosecutor engaged in misconduct by the use of the "guilty" slide.  It is one of the errors identified in his cumulative-error assignment.

1. Prosecution's Use of "Guilty" on a Visual Aid During Opening Statement

**{¶37}** During its opening statement the prosecution used a PowerPoint presentation that included a slide with the word "guilty" in large font. Thompson argues this surpassed the permissible threshold of fair comment afforded during opening statements and the result "was to burn the word 'Guilty' upon the minds of the jurors from the very start of trial." Both Fannon and Thompson's trial counsel moved for a mistrial at the conclusion of opening statements, arguing that the prosecution "can't put a sign in front of the jury" with the word "guilty." The trial court overruled the motion on the ground that the prosecutor is asking in opening statement that the jury find the defendant guilty and "merely repeating the word on the board is not inflammatory or prejudicial to the extent that it requires a mistrial."

**{¶38}** "The test for prosecutorial misconduct is whether the conduct was improper and, if so, whether the rights of the accused were materially prejudiced." *State v. Leonard*, 4th Dist. Athens No. 08CA24, 2009-Ohio-6191, ¶ 36, citing *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 45. "The 'conduct of a prosecuting attorney during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial.' " *Id.*, quoting *State v. Givens*, 4th Dist. Washington No. 07CA19, 2008-Ohio-1202, ¶ 28. "Prosecutorial misconduct constitutes reversible error only in rare instances." *State v. Edgington*, 4th Dist. Ross No. 05CA2866, 2006-Ohio-3712, ¶ 18, citing *State v. Keenan,* 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993). "The 'touchstone of analysis * * * is the fairness of the trial, not the culpability of the prosecutor. * * * The Constitution does not guarantee an "error free, perfect trial." ' " (Ellipses sic.) *Leonard* at ¶ 36.

**{¶39}** Although a prosecutor may not express a personal opinion on the guilt of the accused, a prosecutor can ask that a jury return a finding of guilty. *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 115. In *Pickens* the Supreme Court of Ohio reviewed a prosecutor's opening statement and found nothing improper about a request that the jury find the accused guilty:

> A prosecutor may not express his personal opinion as to the guilt of the accused. A prosecutor can, however, express a conclusion of guilt based on what the state believes that the evidence will show. *See State v. Gibson,* 4th Dist. Highland No. 03CA1, 2003-Ohio-4910, 2003 WL 22136241, ¶ 39–40. Here, the prosecutor argued that the jury should return a finding of guilt after the state had outlined the evidence that the jury would hear. Thus, the prosecutor's remarks did not represent an improper opinion regarding Pickens's guilt.

*Id.* "During opening statement, counsel is accorded latitude and allowed fair comment on the facts to be presented at trial." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-

6235, 818 N.E.2d 229, ¶ 157. *See, also, e.g., State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 126.

**{¶40}** Though it is not evident from the trial transcript Thompson contends, and the state agrees, that the state used a PowerPoint presentation "to explain to the jury the burden of proof it must meet and the evidence it intended to show to meet the burden." The prosecutor's opening statement outlined the elements of the crimes, the evidence the state intended to present, and concluded:

> We ask after reviewing the evidence and testimony the State believes that it will satisfy each and every element beyond a reasonable doubt and we ask that you bring a guilty verdict back for all three counts. Thank you and thank you for your service.

The state contends the slide did not express the prosecutor's personal opinion of Fannon and Thompson's guilt, but only "mirrored" the request for a guilty verdict by placing the word "guilty" at the conclusion of the PowerPoint presentation.

**{¶41}** As this appears to be a case of first impression in Ohio, the state cites case law from other jurisdictions to support its position. However, much of it deals with closing arguments, rather than opening statement. In *Spence v. State*, 129 A.3d 212 (Del. 2015), the Supreme Court of Delaware observed that "the use of PowerPoint presentations and their acceptable boundaries in criminal prosecutions present issues of first impression in Delaware," so the court examined recent decisions from other state courts. *Id.* at 220. In *Spence* a number of PowerPoint slides were shown to the jury during closing argument, including one with a photograph of the victim's bloody body and the words "Terror," "Fear," and "Murder," and another with the statement, "The defendant is guilty of all the charges against him[.]"

**{¶42}** The *Spence* court reviewed cases from Washington, Nevada and North Dakota involving PowerPoint slides with various photographs, images and superimposed text, noting:

> These cases demonstrate that the question of whether slideshow presentations rise to the level of prosecutorial misconduct is a highly-contextualized and fact-specific analysis. As a general matter, PowerPoint presentations are not inherently good or bad. Rather, their content and application determines their propriety. This Court does not seek to discourage the use of technology in closing arguments to summarize and highlight relevant evidence for the benefit of the jury. But slides may not be used to put forward impermissible evidence or make improper arguments before the jury. A PowerPoint may not be used to make an argument visually that could not be made orally. While prosecutors are given latitude in making closing arguments, his or her comments must be limited to properly admitted evidence and any reasonable inferences or conclusions that can be drawn therefrom. The prosecutor may neither misstate the law nor express his or her personal opinion on the merits of the case or the credibility of witnesses. (footnotes omitted)

*Spence v. State*, 129 A.3d 212, 223 (Del.2015) (summarizing the differing holdings of cases it cited). In an accompanying footnote the court further explained:

> It would be, no doubt, perilous for this Court to attempt to derive specific rules regarding visual aids. For example, use of the color red is not always prejudicial. Use of capitalized letters does not necessarily constitute "shouting." The word "guilty," when presented as a written word in a visual aid, does not always constitute an improper expression of a prosecutor's opinion of guilt.

*Id.* at fn. 40.

**{¶43}** Addressing the slide with the statement "The defendant is guilty of all the charges against him," the *Spence* court found it was "improper vouching," which "occurs when the prosecutor implies personal superior knowledge, beyond what is logically inferred from the evidence at trial." *Id.* at 228. The court determined that the state could have used the slide if it had included a qualifier: "While the State asserts that the statement appeared at the end of a series of slides in which it set forth its arguments for

each offense, the State should have included a qualifier before its statement, such as, for example, 'the evidence demonstrates.' " *Id.* at 229. Ultimately the court confirmed Spence's conviction despite the prosecutor's use of objectionable PowerPoint slides because, "even when viewed together, these statements did not cast doubt on the integrity of the judicial process, particularly in light of the substantial amount of evidence presented in the case against Spence, including his own testimony." *Id.* at 230.

**{¶44}** Shortly after *Spence* a Superior Court of Delaware reviewed a closing argument where the prosecutor used a PowerPoint "guilty" slide with defendant's photo. The slide showed "no blood and Defendant does not appear to be injured or unpresentable"; the court found that the slide was permissible and distinguishable from the objectionable slides in *Spence*:

> Unlike the impermissible slide in *Spence*, this slide was not meant to inflame the jury's emotions. Instead, the State was using the slide to visually illustrate what it was otherwise stating during its closing arguments: that Defendant was guilty of murdering Sven Hinds.
>
> \*          \*          \*
>
> The slide that the State used visually depicted the conclusion the State was attempting to convey. The slide listed the witnesses that testified against Defendant and had red arrows that pointed towards a photograph of him indicating that he was guilty. There were no misstatements of law, no personal opinions given about witness credibility, and no impermissible evidence offered. Therefore, the slide was not impermissible and neither trial nor appellate counsel was ineffective for failing to challenge it.

*State v. Taylor,* Del.Super. No. 0907019543A, 2016 WL 1714142, *8 (Apr. 26, 2016), *aff'd*, 150 A.3d 776 (Del.2016).

**{¶45}** In *State v. R.N.*, N.J. App. No. A-5783-14T3, 2017 WL 6546911 (Dec. 20, 2017), The Superior Court of New Jersey analyzed a prosecutor's use of a PowerPoint presentation in closing argument that included a final slide that simply said "GUILTY."

The appellate court agreed with the trial court's reasoning, which had denied

defendant's motion for a new trial and found nothing improper about the slide:

> The court found that the prosecuting attorney's "use of the word guilty on the last slide, while ... saying, 'I'm asking you to return a verdict of guilty,' " was no different from "saying it out loud." The court determined that the manner in which the "guilty slide in the [Powerpoint] was shown" was proper and had no "capacity to divert the minds of the jury," or "be so prejudicial" to defendant to warrant a new trial. (Correction sic.)

*Id.* at *4. *See also State v. Hanato*, 118 Hawai'I 319, 188 P.3d 833 (2008) (use of

PowerPoint slide during closing argument that displayed in large red letters "GUILTY AS

CHARGED" was not prejudicial and did not violate defendant's right to fair trial);

*compare In re Glasmann*, 175 Wash.2d 696, 286 P.3d 673 (2012) (finding improper the

prosecutor's use during closing argument of PowerPoint slides with the defendant's

"unkempt and bloody" booking photo and superimposed text "Guilty, Guilty, Guilty" while

verbally stating "the evidence in this case proves overwhelmingly that he is guilty as

charged and that's what the State asks you to return in this case: Guilty of assault . .

.guilty of attempted robbery . . .guilty of kidnapping . . . guilty of obstructing a police

officer.") *and State v. Walker,* 182 Wash.2d 463, 341 P.3d 976 (2015)  (prosecutor

"repeatedly and emphatically expressed a personal opinion on Walker's guilt" when he

use during closing arguments a PowerPoint presentation with 250 slides where over

100 slides having the heading "DEFENDANT WALKER GUILTY OF PREMEDITATED

MURDER" in bold font) *with In re Hesselgrave*, 200 Wash.App.1029, 2017 WL

3602354, *12 (2017) (it was not an improper expression of personal opinion when

prosecutor used during closing argument a PowerPoint presentation that included two

slides which read "GUILTY" in bold font and verbally asked the jury to find defendant

guilty because "the record reflects that the prosecutor was arguing to the jury that

Hesselgrave was guilty based on the evidence; he was not expressing a personal opinion of Hesselgrave's guilt.").

**{¶46}** In *State v. Rivera,* 437 N.E.Super. 434, 99 A.3d. 847 (2014), the Superior Court of New Jersey addressed the use of PowerPoint presentations in criminal trials as a matter of first impression in that state, "Our courts have not yet addressed the use of PowerPoint presentations during opening statements or summations in criminal trials in a published opinion." *Id.* at 855. The court surveyed the case law from other states and agreed with courts that "determined that a PowerPoint accompanying an opening is permissible if 'the content is consistent with the scope and purpose of opening statements and does not put inadmissible evidence or improper argument before the jury.' " *Id.* quoting *Watters. v. State*, 129 Nev. 886, 313 P.3d 243 (Nev. 2013). The PowerPoint slide in *Rivera* was similar to the PowerPoint slide in *Watters* as both slides were used during the prosecutor's opening statement and both included the defendant's booking photo with the word "GUILTY" superimposed across it. *Id.*

**{¶47}** The *Rivera* court found that a prosecutor's opening statement "should be limited to what the prosecutor 'will prove' and 'not anticipate' the prosecutor's summation." *Id.* at 854. The court determined that the prosecutor exceeded the limitations of opening statement by declaring the defendant guilty of attempted murder both graphically with the last screen of the PowerPoint presentation and orally in the final sentence of his opening statement.  The PowerPoint slide contained the defendant's booking photo and the words "Defendant GUILTY OF: ATTEMPTED MURDER." At the conclusion of the oral portion of the opening statement, the prosecutor said, " 'Defendant is guilty of the attempted murder of a man he stabbed five

times and a man [whose] intestines he tore out.' " *Id.* at 854-855. The court found that these declarations of guilt "at best, implies that it is the prosecutor's opinion," "invades the exclusive province of the jury to resolve factual disputes," and "has the capacity to predispose the jurors to take the prosecutor's view of the evidence." *Id.* at 856. It also "delivers a message in conflict with the State's obligation to convince the jury of the defendant's guilt" and does so "by suggesting the decision has been made." *Id.* at 857.

**{¶48}** In *Watters* the Supreme Court of Nevada reasoned that although the prosecutor orally declared she would ask the jury to find Watters guilty, the use of Watters' "battered" booking photo with "Guilty" superimposed went too far: "the PowerPoint that accompanied her declaration displayed Watters's booking photograph with a pop-up that directly labeled him 'GUILTY.' These are not just two different ways of saying the same thing, as the State suggests. While the oral statement told the jurors that they could expect the prosecutor to ask for a guilty verdict at the end of trial, the PowerPoint slide directly declared Watters guilty." *Watters* at 247-248; *Carter v. State*, Nev.S.Ct. No. 64681, 2014 WL 4686926 (Sept. 19, 2014).

**{¶49}** We agree that "the question of whether slideshow presentations rise to the level of prosecutorial misconduct is a highly-contextualized and fact-specific analysis" and the use of the word "guilty" when "presented as a written word on a visual aid, does not always constitute an improper expression of a prosecutor's opinion of guilt." *Spence*, 129 A.3d 212, at 223, fn. 40. We have long held that a prosecutor may "relate an opinion or belief 'if it is framed in terms of the evidence admitted in the case' " or if it is based on the belief "that at the close of the evidence" the jury "will have no option but to return a verdict of guilty." *State v. Gibson*, 4th Dist. Highland No. 03CA1, 2003-Ohio-

4910, ¶ 39 (discussing *State v. Wells*, 4th Dist. Gallia No. 93CA9, 1994 WL 497745 (Sept. 8, 1994) and *State v. Ulllum,* 4th Dist. Washington No. 83CA23 (May 2, 1985) (unreported)), cited favorably in *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 115.

{¶50}  The prosecutorial statements and PowerPoint slides that were found proper in *State v. R.N., supra,* (slide without defendant's photograph and containing only the word "Guilty") and *In re Hasselgrave*, *supra*, (slide without defendant's photograph and containing only the word "Guilty") are most closely on point. The slide Fannon and Thompson object to closely mirrors the prosecutor's opening statement and contains the words "Conclusion", "Verdict", and the word "Guilty" superimposed over a succinct description of the three counts. It does not include an arrest photo with the text "Guilty" superimposed over defendants' faces. The slide accompanied the prosecutor's opening statement, "We ask after reviewing the evidence and testimony the State believes that it will satisfy each and every element beyond a reasonable doubt and we ask that you bring a guilty verdict back for all three counts." The prosecutor framed his statement as a request based upon "reviewing the evidence and testimony" and asked the jury to "bring a guilty verdict back for all three counts." This does not constitute an expression of the prosecutor's opinion of guilt. Based on this record we find nothing improper about the state's use of the "guilty" slide to aid its opening statement. The slide accomplishes visually what the Court in *Pickens, supra,* said may be properly expressed verbally.  "[A] PowerPoint accompanying an opening is permissible if 'the content is consistent with the scope and purpose of opening statements and does not put inadmissible evidence or improper argument before the jury.' " *Rivera,* 99 A.3d 847,

855, quoting *Watters, supra.* In this context, we find nothing improper about the "Guilty" slide.[3]

{¶51} Additionally, it is well settled that statements of counsel are not to be considered as evidence. *State v. Clark*, 4th Dist. Highland No. 15CA12, 2016-Ohio-2705, ¶ 45; *State v. Canterbury*, 4th Dist. Athens No. 13CA34, 2015–Ohio–1926, ¶ 23. Here, the trial court instructed the jury two different times during the proceedings about opening statements. Before the opening statements, the trial court instructed the jury:

> Opening statements of counsel are concise orderly descriptions of each sides [sic] claims and defenses and the evidence they expect to be produced in support of those claims and defenses. They are not evidence in and of themselves.

Then again prior to its deliberations, the trial court instructed the jury:

> The evidence does not include the indictments of opening [sic], the indictments or the opening statements or closing arguments of counsel. The opening statements and closing arguments of counsel are designed to assist you. They are not evidence.

" 'A presumption always exists that the jury has followed the instructions given to it by the trial court.' " *State v. Murphy*, 4th Dist. Scioto No. 09CA3311, 2010–Ohio–5031, ¶

---

[3] Our review of the law of other states discloses a distinction between what might be considered a proper slide for an opening statement and what might be proper for a closing argument. Courts appear to be far less tolerant of the use of a slide of defendant's unflattering arrest photo with superimposed text "Guilty" when used in a prosecutor's opening statement, but more tolerant of those same slides when used to summarize the evidence in closing statement. *See, e.g., People v. Anderson*, 29 N.Y.3d 69,74, 74 N.E.3d 639, 642, fn. 2 (2017) *cert. denied sub nom. Anderson v. New York*, 138 S.Ct. 457, 199 L.Ed.2d 336 (2017) (court approved the prosecutor's use of slide with defendant's arrest photograph with multiple text boxes superimposed summarizing evidence such as "Lay in wait" "Fired .45 handgun twice"), citing Matthew S. Robertson, Note, *Guilty As Photoshopped: An Examination of Recent Case Law and Scholarship Regarding the Use of Non–Probative Images in the Courtroom*, 55 Washburn L.J. 731, 732 (2016); *State v. Taylor,* Del.Super. No. 0907019543A, 2016 WL 1714142, *8 (Apr. 26, 2016), *aff'd*, 150 A.3d 776 (Del.2016). For an overview, *see* Annotation, *Determination of Prosecutorial Misconduct Arising from Use of Electronic Slide Show Presentation,* 28 A.L.R.7th Art. 3 (2017).

81, quoting *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph four of the syllabus.

**{¶52}** Because the slide was consistent with the scope and purpose of opening statements, its use did not constitute prosecutorial misconduct; the trial court did not err in denying the defendants' motion for a mistrial.

2. Denigration of Defense Counsel during Voir Dire

**{¶53}** Fannon contends that the prosecutor engaged in improper conduct at voir dire by denigrating the defense counsel's role with the following explanation of the participants in the courtroom:

> I kind of want to go over just like the basic roles of prosecutors and defense attorneys and make sure no one, if anyone has any questions that I can answer about that. We see prosecutors as people who pursue justice and the defense attorneys, uh, you know represent their clients zealously and do what's in the best interest of their client. The Judge will provide you with the law and determine any punishment. If there is to be any. You the jury act as fact finders. You don't determine the punishment in a case if there is a verdict that would render one. Does anyone have any questions just based on that general kind of run down on roles. No. Okay.

Fannon argues that the prosecutor "contrasted itself with defense attorneys, claiming that prosecutors do justice while defense attorneys "do their clients bidding" and this "improperly 'denigrates defense counsel'" in a way prohibited in *State v. Keenan*, 66 Ohio St.3d 402, 406, 613 N.E.2d 203 (1993) (prosecutor repeated denigrated defense counsel for making objections, said defense counsel were "paid to get him off the hook," and suggested defense counsel believed their own client was guilty).  Neither defense counsel objected so we review this for plain error.

**{¶54}** The record does not support Fannon's characterization of the prosecutor's statement. The prosecutor did not state that defense counsel "do their

clients bidding" – she said they "represent their clients zealously and do what's in the best interest of their client." The first step in the test for prosecutorial misconduct is to determine whether the remarks were improper. *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 100. We find nothing denigrating or improper about this characterization of defense counsel's role at trial. *See State v. Livingston,* 30 Ohio App. 2d 232, 235, 285 N.E.2d 75 (9th Dist. 1972) ("[t]he adversary system of justice is predicated upon the proposition that justice will most surely prevail when adversaries are pitted one against the other. Under that system, it is the sworn duty of defense counsel to use all honorable and legal means to defend a client charged with a crime"); *State v. Hill,* 75 Ohio.St.3d 195, 204, 661 N.E.2d 1068 (1996) ("Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning.").

**{¶55}** The prosecution's statements about defense counsel's role at trial were not improper and did not constitute prosecutorial misconduct.

3. Photograph of A.T. during Opening Statement

**{¶56}** Next Fannon contends that the prosecutor's opening statement was an "extended appeal to the jury's emotions" that tended to "inflame jury sensibilities." Fannon argues that the prosecutor showed a photograph of A.T., who was sedated and intubated in a hospital bed, and characterized the prosecution as A.T.'s "champion" and Fannon as "the person from whom A.T. needed protection." Because Fannon's counsel failed to object to the alleged prosecutorial misconduct, she forfeits all but plain error.

**{¶57}** The photograph shown during opening statement was not preserved for purposes of appeal. The state represents that the photograph used in opening statement was among those introduced at trial (included as Exhibit 3-C). Fannon does

not refute this in her reply brief. The state argues that the photograph of A.T. was

introduced into evidence and showed the seriousness of the injuries. As a result the jury

saw the photograph again later when it was admitted into evidence. The state also

argues that Fannon mischaracterizes the opening statement; it did not call itself A.T.'s

"champion."

{¶58} Prosecutors have wide latitude in opening statement but cannot use that

opportunity to introduce evidence:

> During opening statement, the prosecution is permitted to refer to
> evidence it intends to present during trial. However, while counsel is
> afforded wide latitude in the presentation of opening statements, counsel
> is not permitted to use that opportunity to introduce evidence. The
> prosecution can summarize evidence, it can describe evidence, it can
> anticipate evidence; however, it risks a mistrial when it engages in an
> attempt to actually introduce evidence. Even when that specific evidence
> is later properly admitted, such a premature use can still potentially result
> in reversible error. The jury instruction about not considering opening and
> closing statements as evidence can only cure so much damage. There is
> some evidence which, taken out of context, can blacken and distort its true
> relevance to the point of prejudice.

*State v. Gilbert*, 10th Dist. Franklin No. 04AP-933, 2005-Ohio-5536, ¶ 16. Even if we

assume the prosecution's action in publishing a photograph of A.T. during opening

statement constituted misconduct it was not prejudicial to Fannon's right to a fair trial.

The court instructed the jury twice that opening statements are not evidence. Moreover,

the photograph was eventually admitted into evidence. *See State v. Hawn*, 11th Dist.

Portage No. 2002-P-0042, 2003-Ohio-5868, ¶ 14-15. And the photo was not so graphic

as to "blacken and distort its true relevance to the point of prejudice." *Gilbert, supra.*

Thus we find no plain error.

{¶59} Fannon's contentions that the prosecutor described himself as the

"champion" and Fannon as "the person from whom A.T. needed protection" in opening

statement is not supported by the record. The prosecutor reviewed the elements of the

crimes charged, the state's burden of proof, summarized the nature of A.T.'s injuries,

what he expected to show through medical records and witness testimony, and

concluded:

> March 1, 2014, this is [A.T.]. That day [A.T.] couldn't fight back. That day [A.T.] couldn't speak out for herself. She couldn't defend herself. She has a voice today and it's the State of Ohio. We ask after reviewing the evidence and testimony that the State believes it will satisfy each and every element beyond a reasonable doubt and we ask that you bring a guilty verdict back for all three counts. Thank you and thank you for your service.

**{¶60}** Contrary to Fannon's representations, the prosecutor did not describe

himself as "champion" and did not describe Fannon as "the person from whom A.T.

needed protection." When we review the opening statement and the actual words

spoken, we find nothing improper or inflammatory about it.

### 4. Fannon on Trial for Enjoying Work

**{¶61}** Fannon also contends the prosecution engaged in misconduct because

"[T]he State put Kayla on trial for enjoying work" and "relied upon stereotypes about

motherhood to inflame the jury." Fannon cites to two places in the record to support her

argument. She did not object to either at trial and forfeited all but plain error.

**{¶62}** The first instance was during Detective Deak's testimony:

> Q. And you asked her what her favorite thing to do was? What was her answer.

> A. Uh, I believe her favorite thing to do was go to work.

Next Fannon cites her cross-examination after she had admitted she missed A.T.'s

follow-up doctor appointment for the "failure to thrive" diagnosis:

> Q. Okay. So you can follow your work schedule. But you can't follow your doctor's appointment schedule.

> A. I guess.

Q. Is your work schedule more important than your daughter's doctor's appointments?

A. No it's not. I had forgotten about the appointment or the car[d] got misplaced or something and I was also looking for a new doctor at the time.

Q. Do you remember talking to Detective Deak at the hospital on March 1, 2014?

A. I do.

Q. In that interview he asked you or Ms. Gyurko asked you what your favorite thing to do was. Do you recall that.

A. I do not remember.

Q. Do you know that you said work?

A. I do not recall saying.

{¶63} We find nothing improper about the prosecution's line of questioning. Part of the state's case focused on the lack of medical care Fannon and Thompson sought for A.T., their lack of concern for A.T.'s injuries, their failure to take her to follow-up appointments, and their delay in seeking medical attention for her even though her injuries were severe, permanent, and life-threatening. As the state explained this line of questioning served to highlight Fannon's lack of responsibility for A.T.'s health and medical condition. It was not an improper attempt to rely "upon stereotypes about motherhood to inflame the jury." We find no error, let alone plain error.

{¶64} We overrule Fannon's second assignment of error. Because Thompson did not identify the "guilty" slide issue as a separate assignment of error, we will incorporate this analysis when we address his "cumulative error" assignment.

C. The Admission of Irrelevant, Prejudicial, or Improper Evidence

{¶65} Both Thompson and Fannon contend that the trial court erred in allowing the state to introduce certain irrelevant, prejudicial or improper evidence. The trial court has broad discretion in the admission or exclusion of evidence; appeals of these

decisions are reviewed under an abuse-of-discretion standard of review. *See State v. Gavin*, 4th Dist. Scioto No. 13CA3592, 2015-Ohio-2996, ¶ 20, citing *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 67, and *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, syllabus. " '[A]buse of discretion' [is] an 'unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken.' " *Kirkland* at ¶ 67, quoting *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23.

### 1. Evidence Related to the Older Child M.F.

**{¶66}** Thompson and Fannon contend that the trial court erred in admitting evidence that Fannon's older child, M.F., had been removed from Fannon's home in 2011. The state's use of evidence of M.F.'s removal was the subject of motion in limine as well as objections at trial. The trial court overruled in part and sustained in part these objections. Evidence of M.F.'s injuries, her removal from the home, and the reasons for the removal were allowed, but at the defense's request, evidence of the agency's "substantiation of abuse" was not introduced to avoid possible jury confusion. The trial court also gave a limiting instruction to the jury concerning "other acts" evidence.

**{¶67}** As a general rule evidence of prior crimes, wrongs, or bad acts is inadmissible if it is wholly independent of the charge for which an accused is on trial. *State v. Spencer*, 2017-Ohio-456, 84 N.E.3d 106, ¶ 66-67 (4th Dist.). Evid. R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid. R.

404(B). " 'When other acts evidence is relevant for one of those limited purposes, the

court may properly admit it, even though the evidence may show or tend to show the

commission of another crime by the accused.' " *Id.* The admissibility of other acts

evidence is "carefully limited because of the substantial danger that the jury will convict

the defendant solely because it assumes that the defendant has a propensity to commit

criminal acts, or deserves punishment regardless of whether he or she committed the

crime charged in the indictment." *In re Sturm*, 4th Dist. Washington No. 05CA35, 2006–

Ohio–7101, ¶ 51 citing *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661, 668

(1992).

> "Evidence of other crimes and acts of wrongdoing must be strictly
> construed against admissibility. [Internal citations omitted.] Such evidence
> is only admissible if the other act tends to show by substantial proof any of
> those things enumerated, such as proof of motive, opportunity, intent,
> preparation, plan, knowledge, identity or absence of mistake or accident."
> *State v. Moore*, 7th Dist. No. 02CA152, 2004-Ohio-2320, ¶ 44. "It is never
> admissible when its sole purpose is to establish that the defendant
> committed the act alleged of him in the indictment." *Id.* However, "the
> decision to admit Evid. R. 404(B) prior acts evidence rests in the trial
> court's sound discretion and that decision should not be reversed absent
> an abuse of discretion." *State v. Hairston*, 4th Dist. Scioto No. 06CA3089,
> 2007–Ohio–3707, at ¶ 38.

*State v. Marshall*, 4th Dist. Lawrence No. 06CA23, 2007–Ohio–6298, ¶ 46.

**{¶68}** The Supreme Court of Ohio has suggested that the probative value of the

other-acts evidence is related to the quality of the state's proof. *State v. Jamison*, 49

Ohio St.3d 182, 187, 552 N.E.2d 180 (1990) ("In this case, the state established the

probative value of the other-acts evidence by the strong quality of its proof. * * * Other-

acts evidence need be proved only by substantial proof, not proof beyond a reasonable

doubt. Yet, the relative high quality of this other-acts evidence in this case establishes

that the prosecution did not attempt to prove one case simply by questionable evidence

of other offenses." (Citation omitted.)). We have also recognized that, "[f]or other acts

evidence to have probative value, substantial proof must exist that the defendant

committed the act." *State v. Wright*, 4th Dist. Washington No. 00CA39, 2001 WL

1627643, *7; *see also State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶

33–34.

{¶69}   The state offered the testimony of Fannon's mother, Mary Fannon, and

case worker Linda Olvera-Caito to demonstrate both identity and the absence of

mistake or accident and offered a limiting instruction for the jury. *See State v.*

*Blankenship*, 9th Dist. No. 16018, 1993 WL 329962 (Sept. 1, 1993) (*Blankenship I*) and

*State v. Blankenship*, 9th Dist. No. 18871, 1998 WL 852632, *4-5 (Dec. 9, 1998)

(reviewing and adopting prior rationale in *Blankenship I).* In its response to Fannon's

motion in limine, the state argued that in 2010 Fannon's parents were awarded

temporary custody of sixteen-month-old M.F.  In 2011, M.F., then a two and one-half

year old, had spent an extended visit with Fannon and Thompson. When M.F. returned

to Fannon's parents, she acted dazed and had multiple bruises.  Fannon told her

mother that M.F. had fallen from a chair and that she had taken M.F. for a C.T. scan.

However, Mary Fannon was unable to locate any C.T. results and was advised by

M.F.'s primary care physician to take M.F. to a hospital for possible abuse. Mary

Fannon took M.F. to Nationwide Children's Hospital where a physician identified

multiple bruises and M.F.'s urine drug screen tested positive for amphetamine. Case

worker Olvera-Caito interviewed Fannon, who denied any knowledge of all but one

bruise, denied injuring M.F., denied knowing who might have injured M.F., and denied

having any knowledge of how amphetamine would appear in M.F.'s urine.  Fannon

acknowledged that her mother told her to take M.F. to the hospital, but she decided not to do it because M.F. seemed better. The agency substantiated a report of neglect and abuse of M.F. who was ordered to remain in her grandparents' custody, Fannon was to have only supervised visitation, and Thompson was ordered to have no contact whatsoever with M.F..

**{¶70}** The state argued based on *Blankenship, supra*, evidence of M.F.'s prior abuse was relevant and admissible to show identity and absence of mistake or accident. In *Blankenship*, Boyd Blankenship was convicted of child endangering and involuntary manslaughter of his six-month old son Mark, who was found dead in his crib from blunt force trauma to the abdomen. The trial court allowed the state to introduce other act evidence that Blankenship had abused his older son Joseph and the appellate court agreed:

> Testimony concerning Boyd's inability to deal with the needs and demands of Joseph, as an infant, resulting in Boyd's abuse of the child, is therefore relevant. When coupled with Boyd's and Mary's extra-judicial statements disclaiming any knowledge as to the cause of Mark's injuries, and the fact that Mark was at all times solely in their care, we find Boyd's past abuse of Joseph "tends to show" both identity and the absence of mistake or accident.

*Id.* at *2.

**{¶71}** Here, the trial court determined that although such evidence is not admissible to prove character, it would be admissible here to show identity, absence of mistake or accident, motive, intent, opportunity, preparation, plan and knowledge. The trial court also found that the evidence is more probative than prejudicial under the circumstances. *See* Evid.R. 403(A). However, the trial court and the state acknowledged defense counsel's concern about potential jury confusion over the agency's "substantiation of abuse claim." The state offered not to introduce testimony of

the agency's ultimate conclusion and the trial court sustained defense counsel's objection. In its instructions to the jury, the trial court gave a limiting instruction on other acts evidence.

**{¶72}** Fannon contends the evidence had little probative value as the incident of M.F.'s abuse was significantly different from that involving A.T.'s abuse, i.e. M.F.'s abuse was "of a substantially different quality" than A.T.'s because "M.F. had bruises, not broken bones." It also differed in that "the jury heard that M.F. tested positive for a controlled substance"[4] and there were no allegations that A.T. had tested positive. Fannon also contends that even though both she and Thompson had access to M.F. during her visit, Thompson's sister was also living with them at the time. Fannon contends that in M.F.'s case no allegations of abuse or neglect were substantiated by a court and the evidence of harm was not strong enough to justify changing her access to M.F.[5] In other words, M.F.'s case was so different from A.T.'s that it lacked sufficient probative value to be admitted.

**{¶73}** Thompson argues the opposite. He contends that the evidence pertaining to M.F. "precisely paralleled" the allegations in A.T.'s case, so much so that it was "highly suggestive of propensity and action in conformity" making it "so highly inflammatory and prejudicial" not even a limiting instruction would have prevented the jury from drawing damaging inferences.

---

[4] Contrary to Fannon's representation, the jury did not hear that "M.F. tested positive for a controlled substance." Instead, the case worker testified that she interviewed Fannon who told her she did not know how M.F. got the bruises and she did not know how M.F. "got the drugs in her system."

[5] Contrary to Fannon's representation that the harm to M.F. was insufficient to change Fannon's access to M.F., the case worker's testimony was that the court ordered supervised visitation. Thus, Fannon's access to M.F. changed – she was no longer allowed unsupervised visits with M.F.

{¶74} Fannon and Thompson challenge different aspects of the trial court's balancing of the probative value with the danger of unfair prejudice – the third step in the three-part test for the admission of other acts evidence. *State v. Williams,* 134 Ohio St.3d 521 at ¶ 22- 24; Evid.R. 403(A). However, the testimony was probative because identity was at issue:  the fact of the crime was open and evident – A.T. suffered physical abuse – but the perpetrator(s) were unknown. "Identity is in issue when the fact of the crime is open and evident but the perpetrator is unknown and the accused denies that he committed the crime. In that event other act evidence tends to show the defendant's identity as the perpetrator by showing that he committed crimes[,wrongs, or acts] of a similar methodology within a period of time reasonably near to the offense on trial, which itself would constitute probative evidence of the probability that the same person, whoever he or she may be, committed both crimes[,wrongs, or acts]." *State v. Morris*, 2012-Ohio-6151, 985 N.E.2d 274, ¶ 24 (9th Dist.).

{¶75} Second, the testimony concerning M.F.'s injuries, Fannon's failure to seek medical care for M.F.'s injuries, and her statement's disclaiming any knowledge about the existence and cause of the injuries, when coupled with Fannon and Thompson's failure to seek medical care for A.T., and their statements disclaiming knowledge of the cause of A.T.'s injuries, tends to show the absence of mistake or accident. *See Blankenship*, *supra; see also State v. Craig,* 4th Dist. Gallia No. 01CA8, 2002-Ohio-1433, ¶ 12 (evidence that defendant "beat the children almost every day" was admissible to show absence of mistake or accident in a child endangering trial); *State v. Nitz,* 12th Dist. Butler No. CA2003-09-228, 2004-Ohio-6478, ¶30-33 (evidence that defendant had imposed excessively, harsh discipline on children in the past tended to

show that defendant's burning of another child with scalding hot water was not an accident).

**{¶76}** Thus Evid.R. 404(B) permitted admission of evidence of M.F.'s abuse because it was relevant to show identity and absence of mistake or accident. And the probative value of the other acts evidence of M.F.'s abuse is not substantially outweighed by the danger of unfair prejudice. Moreover, the trial court instructed the jury that this evidence could not be considered to show that Fannon and Thompson had acted in conformity with that prior conduct. *Williams,* 134 Ohio St.3d 521 at ¶ 24. This instruction lessened any prejudicial effect of the testimony concerning M.F.'s abuse. Considering the broad discretion given a trial court in evidentiary rulings coupled with the trial court's instruction to the jury as to the limited use of other acts testimony, we find nothing "unreasonable, arbitrary, or unconscionable" about the trial court's decision to permit the other acts testimony.

**{¶77}** Concerning the dissimilarities Fannon argues exist, "any dissimilarities 'do not mandate exclusion of the other acts evidence' but instead 'go to the weight to be given the evidence by the jury.' " *Blankenship I* at *2 quoting *State v. Jamison,* 49 Ohio St.3d 182,187, 552 N.E.2d 180 (1990).

### 2. Human Skeleton Diagrams

**{¶78}** Thompson and Fannon also contend that the trial court erred in allowing the state to admit two human skeleton diagrams – Fannon argues the evidence "had no probative value" and Thompson argues the evidence "held zero probative value and was inadmissible." Neither objected to it at trial and forfeited all but plain error.

{¶79}  The state introduced two human skeleton diagrams that Fannon used when she attended a local community college. The diagrams included the scientific names of the bones and Fannon testified that she used them to study for a quiz in a human anatomy class. The state used the diagrams in its closing argument to challenge Fannon's credibility by arguing that Fannon told Detective Deak that her understanding of A.T.'s injuries were too much to remember, yet "it was obvious from those diagrams at one point and time she had a working knowledge of human anatomy."

{¶80}  "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of action more probable or less probable than it would be without the evidence. Evid.R. 401. The human skeleton diagrams were relevant to Fannon's credibility and were admissible. The trial court did not err in admitting them. Because the diagrams were relevant and admissible, Fannon and Thompson have failed to show plain error.

3. Photograph of A.T. Hospitalized

{¶81}  Fannon contends that the trial court committed plain error by admitting a photograph of A.T. while she was intubated, sedated and connected by wire to medical machinery because it was "neither relevant nor probative to the State's theory of serious harm." She did not object at trial and again must show plain error.

{¶82}  The state admitted a series of photographs of A.T.'s injuries taken by Dr. Letson, the child abuse pediatrician at Nationwide Children's Hospital. Dr. Letson testified that the full body photograph of A.T. in the ICU showed her hooked up to an intubator tube for breathing and multiple IV lines in "because she was very ill" and suffered brain injuries. The state argues the photograph was relevant to show serious

physical harm, an element of the state's case, and was not horrendous or used to inflame the passion of the jury.

{¶83}  This photograph of A.T. is relevant evidence that shows A.T. suffered serious physical harm as a result of her injuries. Although it depicts a three-month old sleeping in a hospital crib, hooked up to a number of wires, the photograph is not so gruesome or horrendous that its probative value is substantially outweighed by its danger to inflame the passion of the jury. *See* Evid.R. 403(A) and *State v. Parks,* 3rd Dist. Van Wert No. 15-03-16, 2004-Ohio-4023, ¶ 26 (photo of infant in hospital bed covered with a blanket with bandage around her head and tubes connected to mouth and nose evidences she suffered serious physical harm, an element the state was required to prove and was not so horrendous to inflame the passion of the jury). Therefore, the trial court committed no error, plain or otherwise in admitting the photographs.

## 4. Fannon's Enjoyment of Work

{¶84}  We overruled Fannon's argument that the prosecution engaged in misconduct by putting her on trial for enjoying work. *See* Section B. 4, *supra*. Now Fannon contends that the State "trafficked in stereotypes about gender and motherhood throughout this trial" and the trial court committed plain error by admitting evidence of her love of work. She argues that there is no reasonable inferential link that connects love of work with abuse of children. The state argues that the evidence shows that Fannon chose to work instead of taking A.T. to the doctor and to the hospital.

{¶85}  As we determined in reviewing Fannon's prosecutorial misconduct contention, a part of the state's case focused on the lack of medical care Fannon and

Thompson sought for A.T., their lack of concern for A.T.'s injuries, their failure to take her to follow-up appointments, and their delay in seeking medical attention for her even though her injuries were severe, permanent, and life-threatening. This line of questioning served to highlight Fannon's lack of responsiveness to A.T.'s health and medical condition. As a result it was relevant under Evid.R. 401 and admissible under Evid.R. 402, 403(A). The trial court committed no error, plain or otherwise, in admitting it.

**{¶86}** We have addressed all four issues Fannon presented in her third assignment of error – other acts, skeleton diagrams, A.T.'s hospital photograph, and enjoyment of work evidence – and found them all meritless. The trial court did not commit an error, plain or otherwise, when it admitted this evidence.

5. Text Messages

**{¶87}** Thompson has one remaining contention that the trial court erred in the admission of evidence. He contends as part of his cumulative error argument that the admission of both the text messages and the testimony interpreting them was improper under Evid.R. 602 because the witness lacked personal knowledge of the contents of the text messages.

**{¶88}** Fannon and Thompson voluntarily turned over their cellular phones to the state. Investigator Molly Katusin testified that she retrieved text messages from one of the phones and identified the text messages on the state's exhibit as those that she obtained from that phone. The text messages were sent from "Me"; Katusin testified that she was able to determine who "Me" was. Thompson's attorney objected to the testimony on the ground that there was no foundation for its admission. The trial court

sustained the objection. Then Katusin explained that she had reviewed a number of text messages from the phone and was able to determine from the context that "Me" was Fannon. Consequently, the trial court overruled the objection and stated that both the state and the defense could use cross-examination to explore Katusin's conclusions.

{¶89} Katusin testified that the state's exhibit contained photographs of text messages she took from one of the phones Thompson and Fannon turned over to investigators. Thus, Katusin properly authenticated the text messages under Evid.R. 901(A) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.") and 901(B)(1) (evidence can be authenticated by testimony of a witness with knowledge who testifies that a matter is what it is claimed to be). Katusin had personal knowledge that the photographs of the text messages were from one of the defendants' phones. *See State v. Norris,* 2016-Ohio-5729, 76 N.E.3d 405 (2d Dist.) (text messages are properly authenticated by detective who sufficiently linked defendant to the phone that contained the text messages in question); *State v. Shaw*, 2013-Ohio-5292, 4 N.E.3d 406, ¶ 43 (7th Dist.) (photographs of the text messages can be admissible as an admission by a party-opponent under Evid. R. 801(D)(2) if they are properly authenticated). Thus, Katusin properly authenticated the photographs of the text messages and they were properly admitted into evidence.

{¶90} Turning to the admission of Katusin's testimony about the identity of the sender of the text messages, Katusin testified that her review of other text messages retrieved from the phone allowed her to determine who sent and received them and she was able to determine that "Me" referred to Fannon.

{¶91} And even if Katusin lacked personal knowledge of the identity of the sender, we find any error in the admission of her testimony identifying Fannon as the sender to be harmless. During Fannon's testimony the state questioned her about the text messages and Fannon testified that she was "Me" and that they were text messages between her and Thompson. Thus, even if Katusin lacked sufficient personal knowledge to make her conclusions about the identities of the sender and receiver, the state subsequently established through Fannon's testimony that "Me" was Fannon and the messages were between her and Thompson. *See State v. Thompson,* 2d Dist. Montgomery No. 26954, 2016-Ohio-7521, ¶ 59 (text messages were properly admitted through witness's testimony because she was the recipient and had personal knowledge of their content and could identify the sender).

{¶92} We find no reversible error in the admission of the photographs of the text messages or Katusin's testimony about the sender's identity.

### D. Sufficiency of the Evidence

{¶93} In her fourth assignment of error Fannon claims that her convictions should be reversed because they are not supported by sufficient evidence. She contends that the state failed to prove that she "violated a duty of care" and failed to prove that "A.T. was abused." Her later contention borders on being frivolous in this context. *See* ¶ 6-12.

{¶94} "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Maxwell*, 139 Ohio St.3d 12, 2014–Ohio–1019, 9 N.E.3d

930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991),

paragraph two of the syllabus; *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61

L.Ed.2d 560 (1979).

**{¶95}** "A sufficiency assignment of error challenges the legal adequacy of the

state's prima facie case, not its rational persuasiveness." *State v. Koon*, 4th Dist.

Hocking No. 15CA17, 2016–Ohio–416, ¶ 17. "That limited review does not intrude on

the jury's role 'to resolve conflicts in testimony, to weigh the evidence, and to draw

reasonable inferences from basic facts to ultimate facts.' " *Musacchio v. United States*,

––– U.S. ––––, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016), quoting *Jackson* at 319,

443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

**{¶96}** Fannon was convicted of Endangering Children under R.C. 2919.22 (A),

R.C. 2919.22(B)(1) and Permitting Child Abuse under R.C. 2903.15(A).

> R.C. 2919.22 (A): No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.
>
> R.C. 2919.22(B)(1): No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age: (1) Abuse the child;
>
> R.C. 2903.15(A): No parent, guardian, custodian, or person having custody of a child under eighteen years of age or of a mentally or physically handicapped child under twenty-one years of age shall cause serious physical harm to the child, or the death of the child, as a proximate result of permitting the child to be abused, to be

> tortured, to be administered corporal punishment or other physical disciplinary measure, or to be physically restrained in a cruel manner or for a prolonged period.

**{¶97}** A successful R.C. 2919.22(A) conviction requires the state to prove that: (1) a person having custody or control over (2) a child under eighteen years of age (3) recklessly created a substantial risk to the health or safety of the child (4) by violating a duty of care, protection, or support. *See State v. Swain*, 4th Dist. Ross No. 01CA2591, 2002-Ohio-414, *7. A successful R.C. 2919.22(B)(1) conviction requires the state to prove that: (1) that the child is under eighteen years of age; (2) an affirmative act of abuse occurred; and (3) that the defendant recklessly committed the act of abuse. *Id.* Under the circumstances here, a successful R.C. 2903.15(A) conviction requires the state to prove that: (1) A parent or other person having custody over (2) a child under the age of eighteen (3) caused serious physical harm (4) as a proximate result of permitting the child to be abused.

**{¶98}** To establish an affirmative act of abuse, the State must show that the defendant committed "an act which inflicts serious physical harm or creates a substantial risk of serious harm to the physical health or safety of the child." *State v. Adkins,* 4th Dist. Scioto No. 14CA3674, 2016-Ohio-7250, ¶ 17 citing *Swain, supra; State v. Ivey*, 98 Ohio App.3d 249, 257, 648 N.E.2d 519 (8th Dist. 1994). R.C. 2901.22(C) defines "recklessly":

> "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

**{¶99}** R.C. 2901.01(A)(5) defines "serious physical harm":

(5) "Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

**{¶100}** "[A]n offense's elements may be established by direct evidence, circumstantial evidence, or both. Circumstantial and direct evidence are of equal evidentiary value." (citations omitted) *Swain* at *8.

> "[D]irect evidence of a fact is not required. Circumstantial evidence * * * may also be more certain, satisfying, and persuasive than direct evidence." *State v. Grube*, 987 N.E.2d 287, 2013–Ohio–692, ¶ 30, quoting *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990), citing *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 10, (1960), citing *Rogers v. Missouri Pacific RR Co*, 352 U.S. 500508, fn.17, 77 S.Ct. 443, 449, fn.17, (1957). Even murder convictions and death sentences can rest solely on circumstantial evidence. *Grube, supra*, citing *State v. Apanovitch*, 33 Ohio St.3d 19, 514 N.E.2d 394 (1987); *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236, 1239 (1988)."

*Adkins* at ¶ 15.

### 1. Duty of Care

**{¶101}** Fannon contends the state failed to prove that she violated a duty of care, which is an element of child endangering under R.C. 2919.22(A). Fannon argues that because A.T.'s injuries were "subtle" and the state did not prove that Fannon saw the injuries occur, a rational trier of fact could not determine that Fannon violated a duty

of care by failing to recognize the injuries or assess the extent of them. Her initial contention that injuries were "subtle" is incredulous.

{¶102} The state contends that it proved Fannon violated a duty of care because Fannon (1) failed to take A.T. to the doctor after she was diagnosed with a failure to thrive; (2) knew that A.T. was so ill she was not breathing and failed to seek any kind of medical care; (3) knew that A.T.'s eyes crossed and waited until the following day to take her to the emergency room.

{¶103} Fannon admitted that she had a duty to take A.T. to the doctor after the doctor diagnosed A.T. with a failure to thrive but failed to comply:

> Q. Well, wouldn't it be wise to follow a doctor's recommendation to check her out to make sure that she is actually succeeding. That's the doctor's expertise, isn't it?
>
> A. Yes and I regret that every day.
>
> Q. And you as a parent had that responsibility?
>
> A. Yes I do.
>
> Q. And you failed at that responsibility?
>
> A. Yes I did.

{¶104} Text messages between Fannon and Thompson showed that as early as Tuesday, February 25, 2014, Fannon was very concerned about A.T.'s health because A.T. was not breathing. In her testimony about the messages, Fannon testified that she texted Thompson to tell him A.T. needed to see a doctor because A.T. was not breathing. Fannon's texts to Thompson disclosed that Fannon was "scared" and that A.T.'s condition was "worse than i thought." Fannon had to breathe in A.T.'s face three different times to get her to breathe. Although from these texts it appears Fannon was

administering infant CPR to A.T., at trial Fannon testified that she was not doing a resuscitation, only "a light blow." Fannon admitted she did not get medical attention for A.T. even though A.T. was struggling to breathe.

**{¶105}** The state presented evidence that on Thursday, February 27, Fannon and Thompson had concerns because A.T.'s eyes were crossing or slanting downward, yet Fannon did not seek medical attention for A.T.. On Friday, February 28, Fannon noticed A.T.'s right leg was swollen and bruised at about 3:00 pm, but did not seek medical attention for A.T. until about 9:20 pm that evening. A co-worker testified that Fannon called her between 2:00 and 3:00 pm to ask her to work Fannon's shift so that Fannon could take A.T. to the hospital. During that seven-hour window, Fannon called off work, continued to observe A.T., and went to a fast-food restaurant. Fannon explained that she "didn't think a few more minutes was going to hurt anything" even though Fannon knew A.T.'s condition was serious, "It was serious, I just knew it wasn't life threatening."

**{¶106}** Fannon testified that when she finally did get medical care for A.T. at the local hospital, A.T. was immediately transported to Nationwide Children's Hospital where physicians determined that A.T. had multiple broken bones, a complex skull fracture, and a life-threatening brain injury.

**{¶107}** Citing *State v. Miley*, 114 Ohio App.3d 738, 684 N.E.2d 102 (4th Dist. 1996), Fannon argues that the state needed to present proof that she was with A.T. when she was injured or able to observe her injuries. However, in *Miley* the state presented no evidence that the defendant observed any outward signs of abuse on the child. We found that although the child may have cried, crying alone was not sufficient

to be an outward sign of abuse. *Id.* at 744-745. Here the state presented evidence that

A.T. suffered multiple abusive injuries over a period of time and that these injuries

manifested outwardly in head and leg bruises, severe respiratory distress, and eye-

crossing. The state presented evidence that Fannon observed these signs but acted

recklessly when she did not seek immediate and appropriate medical care for A.T.

{¶108}  After viewing this evidence in a light most favorable to the prosecution,

any rational trier of fact could have found beyond a reasonable doubt that Fannon

violated a duty of care under R.C. 2919.22(A) when she repeatedly failed to get A.T.

appropriate and timely medical care.

## 2.  Physical Abuse

{¶109}  Fannon contends that the state failed to prove that A.T.'s injuries were

caused by abuse, which is an element of endangering children under R.C.

2919.22(B)(1) and an element of permitting child abuse under R.C. 2903.15(A).  In spite

of the almost frivolous nature of this contention, we proceed. *But see* ¶ 18-25 above.

{¶110}  Fannon argues that the testimony of the treating physicians, Dr. Adler

and Dr. Letson, who were also qualified to testify as expert witnesses in pediatric

radiology and child abuse/pediatrics respectively, did not give their medical opinions "in

terms of possibility or probability" and therefore their opinions were inadmissible.

{¶111}  Likewise, Thompson contends that the medical witnesses did not

advance their opinions to the "reasonable degree of medical certainty" required by

Evid.R. 702. He includes this as one of the errors that, while we may conclude is

harmless, was cumulatively prejudicial. Thompson argues that the doctors' findings and

interpretations "were improper" because the foundational requirements of Evid.R.

702(C) were not present.

{¶112}  Contrary to Thompson's assertion, in *State v. D'Ambrosio*, 67 Ohio St.3d

185, 191, 1993-Ohio-170, 616 N.E.2d 909, the court held that expert witnesses in

criminal cases can testify in terms of possibility rather than in terms of a reasonable

scientific certainty or probability. In *D'Ambrosio*, the medical expert testified that it was

"physically possible" that all the wounds could have been made by the same knife.  The

defendant argued that the testimony should have been excluded because it was not

stated in terms of "a reasonable medical certainty or probability." The Court held that the

testimony was admissible:

> While several decisions from this court indicate that speculative opinions
> by medical experts are inadmissible since they are based on possibilities
> and not probabilities, see*, e.g., Shumaker v. Oliver B. Cannon & Sons,
> Inc.* (1986), 28 Ohio St.3d 367, 28 OBR 429, 504 N.E.2d 44, we believe
> that the better practice, especially in criminal cases, is to let experts testify
> in terms of possibility. See Giannelli, Ohio Evidence Manual (1988) 98,
> Section 702.05, and Jacobs, Ohio Evidence (1989) 168, Section 702–03.

*Id.* at 191. "Questions about the certainty of the scientific results are matters of weight

for the jury." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶¶

73-77 (2011) citing *State v. Allen*, 5th Dist. No. 2009–CA–13, 2010-Ohio-4644, ¶ 157;

{¶113}  Fannon relies on *State v. Westley*, 8th Dist. Cuyahoga No. 104847,

2017-Ohio-7717 to support her argument that medical expert testimony must be given

in terms of "possibility or probability" to be admissible.  Fannon mischaracterizes the

holding in *Westley*. There the court found that even assuming that the expert testimony

"satisfied the *D'Ambrosio* 'possibility' standard for criminal cases" the state failed to

meet its burden in offering sufficient evidence "to establish that reckless conduct by

Westley resulted in harm" to the child. The outcome in *Westley* is distinguishable on that basis.

**{¶114}** More importantly, "a set of magic words" is not necessary. *See State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d. 1028, ¶ 162 ("under Evid.R. 702, experts are not required to use any particular 'magic words.' * * * an expert's opinion is admissible so long as it provides evidence of more than mere possibility or speculation"). The state presented considerable testimony from treating physicians about the extent of A.T.'s injuries and possible causes. *See* ¶ 18-25. Medical experts gave a definitive diagnosis of "physical abuse which included abuse of head trauma" with certitude. Therefore, it was admissible under *D'Ambrosio, supra,* and *Beasley*. The record contains an abundance of expert medical testimony about the nature, extent, and cause of A.T.'s injuries from which the jury could have found beyond a reasonable doubt that A.T.'s injuries were caused by abuse as required under R.C. 2919.22(B)(1) and R.C. 2903.15.

**{¶115}** Because any rational trier of fact could have found beyond a reasonable doubt that Fannon violated a duty of care under R.C. 2919.22(A) when she repeatedly failed to get A.T. appropriate and timely medical care, and that A.T.'s injuries were caused by abuse as required under R.C. 2919.22(B)(1) and R.C. 2903.15, we reject her insufficiency arguments with our own degree of certitude.

**{¶116}** We reject Thompson's argument that the doctors' findings and interpretations "were improper" because the state failed to satisfy the foundational requirements of Evid.R. 702(C). We already decided the medical expert testimony was admissible. Because Thompson includes this error as one of the cumulative errors

identified in this first assignment of error, we will reference this analysis when we

address Thompson's first assignment of error.

E. Ineffective Assistance of Counsel

**{¶117}** In her final assignment of error Fannon contends that she was denied

the effective assistance of counsel when trial counsel (1) failed to move to sever her trial

from Thompson; (2) failed to object to prosecutorial misconduct; (3) failed to object to

the admission of irrelevant and prejudicial evidence; (4) failed to make a proper Crim.R.

29 motion; and (5) failed to rehabilitate Fannon's image during closing argument.

**{¶118}** To prevail on a claim of ineffective assistance of counsel, a criminal

appellant must establish (1) deficient performance by counsel, i.e., performance falling

below an objective standard of reasonable representation, and (2) prejudice, i.e., a

reasonable probability that, but for counsel's errors, the result of the proceeding would

have been different. *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d

1121, ¶ 113; *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d

674 (1984); *State v. Knauff*, 4th Dist. Adams No. 13CA976, 2014-Ohio-308, ¶ 23. In

Ohio a properly licensed attorney is presumed competent. *State v. Gondor*, 112 Ohio

St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62. Thus, in reviewing the claim of

ineffective assistance of counsel, we must indulge in "a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that

is, the defendant must overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.' " *Strickland* at 697.

Failure to satisfy either part of the test is fatal to the claim. *Id.*; *State v. Bradley*, 42 Ohio

St.3d 136, 143, 538 N.E.2d 373 (1989).

{¶119}  Fannon cannot establish deficient performance by counsel. We have addressed each of the underlying issues and found no grounds to sever, no prosecutorial misconduct, no errors in the admission of evidence, and sufficient evidence that she violated a duty of care and A.T.'s injuries were caused by abuse to sustain her convictions on those grounds.

{¶120}  Fannon's contention that her trial counsel gave an inadequate closing argument because it failed to rehabilitate her image also fails. However, we are reminded of the colloquialism that "you can't make chicken salad out of chicken * * * *." Moreover, counsel has great latitude in deciding what to include in closing argument in light of what has transpired during the trial.  *See State v. Bradley*, 42 Ohio St.3d 136, 144, 538 N.E.2d 373, 381–82 (1989) (counsel's decision not to make a closing argument that would help to "humanize" the defendant "must be viewed as tactical decisions and do not rise to the level of ineffective assistance"). When trial counsel gave his closing argument, Fannon was on the lam. In any event Fannon has not shown that there is a "reasonable probability" that but for counsel's actions, the result of the case would have been different. Therefore, she has not met the burden of proving prejudice.

{¶121}  We now turn to the remaining issues that Thompson alone has raised.

F. Cumulative Errors

{¶122}  As his first assignment of error Thompson contends that his conviction must be reversed because the cumulative effect of errors throughout the proceedings deprived him of his right to a fair trial.  Thompson identifies six issues for review. We have previously addressed five of the six issues and found no error:

(1) We addressed the use of the "guilty" slide when we considered Fannon's contention of prosecutorial misconduct. We found that the prosecutor's use of the guilty slide was not improper. See Part B, 1.

(2) We addressed the admissibility of the medical experts' testimony when we considered Fannon's contention that there was insufficient evidence of abuse to support her conviction. We found that the trial court did not err in admitting the medical experts' testimony. See Part D, 2.

(3) - (5) We addressed the admissibility of the "other acts" evidence of M.F.'s abuse, the skeleton diagrams, and the text messages when we considered Fannon's contention that the trial court erred in admitting irrelevant and prejudicial evidence. We found that the trial court did not err in admitting evidence of M.F.'s abuse, the skeleton diagrams or the text messages. See Part C, 1, 2, and 5.

{¶123} That leaves Thompson with one remaining issue for review under his cumulative error assignment of error:  whether the jury instruction pertaining to reasonable doubt was proper. Thompson concedes that the jury instruction comes directly from the Ohio Jury Instructions but argues that although "a panel of esteemed members of the bar may have drafted the standard 'reasonable doubt' OJI instruction many years ago, it may be time for the current committee members to revisit the wording." He hopes "some intrepid trailblazer in the judiciary or legislature will see fit to tackle this issue * * *." He will have to wait for that visionary action.

{¶124} Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to

a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995), citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus; *State v. Ruble*, 2017-Ohio-7259, 96 N.E.3d 792, ¶ 75 (4th Dist.). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Smith*, 2016-Ohio-5062, 70 N.E.3d 150, ¶ 106 (4th Dist.) citing *State v. Harrington*, 4th Dist. Scioto No. 05CA3038, 2006-Ohio-4388, ¶ 57.

**{¶125}** The cumulative error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.' " *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 148 (2014) ("And to the extent that Mammone more broadly invokes the doctrine of cumulative error, that doctrine does not apply because he cannot point to 'multiple instances of harmless error.' " *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).). Here with only one remaining contention of error, the cumulative error doctrine is inapplicable.

**{¶126}** Nonetheless, we will briefly address the jury instruction. The trial court gave a jury instruction on reasonable doubt straight from the Ohio Jury Instruction (OJI) and R.C. 2901.05(E) (formerly subpart (D)). The Supreme Court of Ohio has repeatedly held that this instruction is proper. *See State v. Jones*, 91 Ohio St.3d 335, 347-348, 2001-Ohio-57, 744 N.E.2d 1163 ("We have repeatedly affirmed the constitutionality of R.C. 2901.05(D)'s definition of reasonable doubt."); *State v. Frazier,* 73 Ohio St.3d 323, 330, 1995-Ohio-235, 652 N.E.2d 1000 ("the definition of reasonable doubt provided in

R.C. 2901.05(D) accurately imparts the concept of reasonable doubt and does not diminish the state's requirement to prove guilt beyond a reasonable doubt").

**{¶127}** The doctrine of cumulative error does not apply here. Moreover, we find no error in the trial court's jury instruction on "reasonable doubt." We overrule Thompson's first assignment of error.

G. Allied Offenses of Similar Import

1.  General Principles and Standard of Review

**{¶128}** In his second assignment of error Thompson contends that the trial court erred in failing to merge his convictions at sentencing because they were allied offenses of similar import, thus violating the double jeopardy protection against cumulative punishments for the same offense.

**{¶129}** The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  This protection applies to Ohio citizens through the Fourteenth Amendment and is additionally guaranteed by Article I, Section 10 of the Ohio Constitution. This constitutional protection prohibits multiple punishments in a single trial for the same conduct in the absence of a clear indication of contrary legislative intent. *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).

**{¶130}** The General Assembly enacted R.C. 2941.25 to identify when a court may impose multiple punishments:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶131}** The trial court's duty to merge allied counts at sentencing is mandatory. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 26. But the defendant bears the burden of establishing entitlement to the protection of R.C. 2941.25. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18. We apply a de novo standard to review a trial court's determination of whether offenses constitute allied offenses of similar import requiring merger under R.C. 2941.25. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28; *State v. Cole*, 4th Dist. Athens No. 12CA49, 2014-Ohio-2967, ¶ 7.

**{¶132}** In *State v. Ruff*, 143 Ohio St.3d 114, 2015–Ohio–995, 34 N.E.3d 892, which focused largely on the issue of dissimilar import, the Supreme Court of Ohio clarified the appropriate analysis to determine whether two offenses merge under R.C. 2941.25. "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import." *Id.* at paragraph one of the syllabus. "Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus.

2. Analysis

**{¶133}** Thompson was convicted of Endangering Children under R.C. 2919.22

(A) and R.C. 2919.22(B)(1), and Permitting Child Abuse under R.C. 2903.15(A). The

state charged Thompson with:

Count 1:  R.C. 2919.22(B)(1): No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age: (1) Abuse the child;

Count 2:  R.C. 2903.15(A): No parent, guardian, custodian, or person having custody of a child under eighteen years of age or of a mentally or physically handicapped child under twenty-one years of age shall cause serious physical harm to the child, or the death of the child, as a proximate result of permitting the child to be abused, to be tortured, to be administered corporal punishment or other physical disciplinary measure, or to be physically restrained in a cruel manner or for a prolonged period.

Count 3:  R.C. 2919.22 (A): No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

**{¶134}** Thompson contends he has problems applying the three-part *Ruff*

analysis. He cannot address whether the crimes are offenses of dissimilar import

because of "the broad, vague manner in which the prosecution presented and pursued

the case." He cannot address whether they were committed separately because "there

is no way to figure this out due to the manner in which the state * * * presented the case

against Thompson." He cannot address whether there was a separate animus for each

offense because "[a]gain, the vagueness in the record precludes this finding." In

essence, Thompson argues that there is no way for him to show from the record

whether the offenses should merge.

{¶135} At this point it is crucial to point out we are not asked to review the sufficiency of the evidence to support a finding of guilt on the two convictions for child endangering or the sole count of permitting child abuse. This assignment of error does not contest the evidence to support who did what, when. It simply argues the state took a "shotgun approach" to support each of the three counts against Thompson. That may in fact be the case, but we are charged with deciding assignments of error, not mere arguments. *State v. Owens,* 2016-Ohio-176, 57 N.E.3d 345, ¶ 59 (4th Dist.) quoting *State v. Nguyen*, 4th Dist. Athens No. 14CA42, 2015-Ohio-4414, ¶ 41 (" 'we review assignments of error and not mere arguments' ").

{¶136} Likewise, it is not our duty to create arguments for an appellant. *State v. Doughman,* 2017-Ohio-4253, 92 N.E.3d 30, ¶ 27. And in fact, it is the defendant's duty to raise and prove the applicability the merger protection of R.C. 2941.25. *State v. Washington,* 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18.

{¶137} Nonetheless, after reviewing the record we find no error in the trial court's decision not to merge the offenses. Counts 1 and 3, child endangering under R.C. 2919.22(A) and R.C. 2919.22(B)(1) are not subject to merger because they are dissimilar in import – they involved separate protected societal interests and resulted in separate identifiable harm.  The two statutes are designed to protect different societal interests. R.C. 2919.22(B)(1) protects a child from direct abuse by a parent. Subpart (A) enforces a parent's societal duty to provide care and protection for health issues, however they arise.  *State v. Earley,* 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 15. Under Count 1, Endangering Children, R.C. 2919.22(B)(1), Thompson "abused the child" when he inflicted physical injuries to A.T.  Under Count 3,

Endangering Children, R.C. 2919.22(A) Thompson, as a parent, created a substantial risk of physical harm to A.T. and "violated a duty of care" when he failed to seek medical care for A.T.'s injuries. And because the medical testimony established that there were multiple instances of abuse over a period of time, the record supports a finding of multiple counts of endangering children, which could fall under either of the two statutory provisions. Moreover, the two endangering children offenses resulted in different harm, i.e. the short term physical harm resulting from direct abuse, i.e. broken bones and tissue injuries, and the long term/permanent injury that resulted from the failure to seek prompt medical attention. *See generally State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414, ¶ 129; *see Earley* at ¶ 15.

{¶138} Count 2, Permitting Abuse, R.C. 2903.15(A) and Count 3, Endangering Children, R.C. 2919.22(A), do not merge because they involve separate criminal acts. Under Count 3, Endangering Children, R.C. 2919.22(A) Thompson violated a duty of care as a parent when he failed to seek timely and appropriate medical care for A.T., i.e. the criminal act under Count 3 was Thompson's failure to seek medical care for the infant's many injuries, which occurred over time. Under Count 2, R.C. 2903.15(A) Permitting Abuse, the jury convicted Thompson of allowing another person to abuse the infant. Because two separate acts of criminal conduct are involved here, Permitting Abuse under R.C. 2903.15(A) and Endangering under R.C. 2919.22(A) do not merge.

{¶139} Likewise Count 1, Endangering Children by abuse, R.C. 2919.22(B)(1) and Count 2, Permitting Abuse, R.C. 2903.15(A) should not merge because they also involve separate criminal acts. Under Count 1, Thompson abused the child when he inflicted physical injuries to A.T. and, under Count 2, the jury found that he permitted

abuse when he allowed A.T. to be abused by another. Thus, the offenses did not arise from the same conduct. Moreover the different conduct resulted in different and separate physical harm, i.e. the medical experts testified that the multiple injuries A.T. suffered were caused by at least two separate traumatic episodes of abuse over time.

{¶140} The record does not support a finding that the crimes were subject to merger under R.C. 2941.25. We overrule Thompson's second assignment of error.

### H.  Extradition Costs

{¶141} Thompson contends that the trial court abused its discretion when it waived his court costs in the underlying child abuse case due to his indigent status but refused to waive the costs associated with "extradition" for failure to appear.  Thompson argues that the trial court's partial denial of his motion to waive court costs "suggests a punitive purpose or effect." However, Thompson cites nothing in the record that supports his hunch. Therefore he has failed to burden to affirmatively show error on the part of the trial court.

### IV. CONCLUSION

{¶142} Fannon and Thompson have not established any prejudicial error by the trial court in convicting and sentencing them.  Having overruled their assignments of error, we affirm their convictions and sentence.

JUDGMENT AFFIRMED.

Abele, J., concurring:

{¶143}  I agree with the principal opinion's disposition of the appellants' assignments of error and affirmance of the trial court's judgment.  I write separately to comment about what appears to be a disturbing trend of elaborately crafted opening statements that utilize power-point projections, photographs that the prosecution expects to be admitted into evidence and other visual aids.

{¶144}  Generally, the purpose of an opening statement is to provide the trier of fact a brief outline or preview of the evidence expected to be presented at trial. Comments about the scheduled witnesses, their expected testimony and the elements of the charged crimes are, of course, appropriate and provide the trier of fact with an important framework about the evidence that will be presented.  In the case sub judice, however, during opening statement the prosecution projected the word "GUILTY" in large letters on a screen.  Although I recognize that this tactic has been used in other courts, this strikes me as a not-so-subliminal message to each juror about their expected role in the proceeding.  Also, the prosecution's opening statement included a hospital bed photograph that depicted the child victim's severe trauma.  This photograph had not yet been, at this juncture, admitted into evidence.  In my view, a party making an opening statement should not display objects that the party anticipates might be admitted into evidence, but has not yet been marked as an exhibit, identified by a witness with knowledge and properly admitted into evidence.  Obviously, unforseen events could arise that could result in the court rejecting a party's request to admit an exhibit into evidence.

**{¶145}** Finally, I presume that defendants must now be permitted to engage in some sort of pretrial discovery practice to determine the exact nature of the visual aids that the prosecution intends to use during opening statement.  This will allow a defendant to prepare a competing number of visual aids to counterbalance the impression the prosecution will attempt to create with the jury.  To me, however, this is a waste of time and judicial resources.

**{¶146}** In the end, although I recognize these tactics may not always rise to the level of reversible error, I nevertheless believe that the best policy is for courts to exercise their discretion and limit these elaborate opening statement presentations. The ends of justice will be better served in this manner.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that Appellants shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellants to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellants to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hoover, P.J.: Concurs in Judgment and Opinion.
Abele, J.       Concurs in Judgment and Opinion with Concurring Opinion.

For the Court

BY: _____
William H. Harsha, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**